# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michelle Weaver,                                    Civil No. 07-cv-2823 (JMR/AJB)

        Plaintiff,

v.                                                  **Report and Recommendation on the
                                                    Parties' Cross Motions
                                                    for Summary Judgment**

Michael J. Astrue, Commissioner of
Social Security,

        Defendant.

_____

Lionel H. Peabody, Esq., for Plaintiff, Michelle Weaver.

Frank J. McGill, Jr., Acting United States Attorney and Lonnie F. Bryan, Assistant United States Attorney, for Defendant, the Commissioner of Social Security.

_____

## <u>Introduction</u>

Michelle Weaver ("Plaintiff") disputes the unfavorable decision of the Commissioner of the Social Security Agency ("Commissioner") ending her disability as of March 1, 2005.  This matter is before the Court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross motions for summary judgment.  <u>See</u> 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.  This Court has jurisdiction under the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3).  Based on the reasoning set forth below, this Court **recommends** that the Commissioner's Motion for Summary Judgment [Docket No. 11] be **denied** and that Plaintiff's Motion for Summary Judgment [Docket No. 8] be **granted.**

## <u>Procedural History</u>

Plaintiff filed an application for a Period of Disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"). See Mem. 1 [Docket No. 9]. On February 16, 2001, the Social Security Administration ("SSA") found that Plaintiff became disabled as of October 1, 2000 (Tr. 32-33). On a continuing disability review, the SSA found that Plaintiff was no longer disabled as of March 1, 2005 (Tr. 38-40). A hearing was held on August 4, 2006, before Administrative Law Judge Michael D. Quayle ("ALJ") per Plaintiff's request (Tr. 41-47, 508-39). On October 3, 2006, the ALJ found that Plaintiff's disability ended on March 1, 2005 (Tr. 17). On December 5, 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the ALJ's decision the final decision of the Commissioner (Tr. 9-11). See 20 C.F.R. §§ 404.981, 416.1481. On June 14, 2007, Plaintiff sought review from this Court. The parties thereafter filed cross motions for summary judgment.

**Factual Background and Medical History**

*Factual Background*

Plaintiff was born on April 20, 1958, and at the time of the ALJ's decision, was 48 years old (46 years old on March 1, 2005)(Tr. 26). Plaintiff only completed school through 8th grade, but did receive her GED (Tr. 26). At the time of the hearing in front of the ALJ, Plaintiff was single with no children under the age of 18 (Tr. 511). Plaintiff was formerly employed as a deli worker, small products assembler, and ticket agent (Tr. 25).

Plaintiff, represented by counsel, testified that she was still receiving social security benefits at the time of the August 4, 2006, hearing (Tr. 513). She began receiving benefits in October of 2000 after a slip and fall accident in the building of her previous employer, Ticket Master (Tr. 514, 535-36). Plaintiff shortly thereafter lost her job as a ticket agent and went into a

deep depression (Tr. 514-15, 535-36).[1]  Her depression issues were so severe that she was

psychiatrically hospitalized several times (Tr. 231-37, 246-49, 514).  Plaintiff also received

medical assistance and food stamps (Tr. 513).

Since April of 2006, Plaintiff had been working at Minnesota Diversified Industries

("MDI")(Tr. 512).  At that time, Plaintiff was still dealing with depression issues, including

thoughts of suicide and episodes of crying (sometimes as long as a couple hours)(Tr. 515-517).

Plaintiff battled these thoughts and emotions almost every day (Tr. 522).  These mental issues

made it hard for Plaintiff to socialize with people, keep her house organized, and be active (Tr.

516).  At the time of the hearing, Plaintiff stated that she was still dealing with these mental

issues (Tr. 523).  Plaintiff also had problems sleeping at night (Tr. 523).

Plaintiff tried not to let these issues affect her work at MDI (Tr. 516).  Plaintiff stated,

"[I]f I don't work, I can't take care of myself.  And I can't–if I can't take care of myself, I'm on

the streets, and that just doesn't sit well with me" (Tr. 516).  According to Plaintiff, MDI did

have two vocational counselors to help her (Tr. 518).  However, Plaintiff felt that the counselors

were very reluctant to answer her vocational questions (Tr. 519).[2]

Plaintiff was paid $7.82 per hour at MDI.  Her base wage was $7.91 per hour, but her

hourly rate was reduced $0.09 per hour because she failed to meet the company's performance

standards for producing tote boxes (Tr. 519-20).  Plaintiff claimed that her hand pain was one of

---

[1] When the ALJ asked Plaintiff why she was fired from Ticket Master, she claimed that they did not give her a reason for terminating her employment (Tr. 536).  Plaintiff stated that she missed about a week of work from the fall and that this was not a contributing factor to her termination (Tr. 536).

[2] Plaintiff testified that when she did get a hold of the counselors they either answered her question right there or she had to "hunt them down for an answer" (Tr. 519).

the reasons for her subpar productivity (Tr. 520).  According to Plaintiff, the pain began while

working only part-time at MDI (Tr. 521).[3]  On two separate occasions Plaintiff was sent home

from work due to her hand pain (Tr. 520).  Plaintiff testified that she often has hand pain to this

day (Tr. 526).  Plaintiff also claimed her problems with sleeping at night affected her work

performance (Tr. 523).  MDI had sent her home from work for falling asleep on the job (Tr.

520).[4]

She also missed a week of work in June to visit her dying mother (Tr. 521).  Plaintiff

claims that her mother's death made it hard for her to focus and stay on task throughout the work

day (Tr. 524).  This inability to stay focused also affected Plaintiff's ability to take care of her

home (Tr. 524).  However, Plaintiff indicated that most of the time her problems did not affect

her ability to take care of herself (Tr. 525).

### *Medical History*

The January 2001 findings of consultative psychiatrist, Alford S. Karayusuf, M.D.,

supported the SSA's decision on February 16, 2001, that Plaintiff was disabled as of October 1,

---

[3] When Plaintiff first started working at MDI she was working four hours a day (Tr. 525).
Plaintiff had this schedule for two to three days (Tr. 525).  Plaintiff then worked for roughly two
days for six hours (Tr. 525).  MDI believed that after a week to a week and a half at this
schedule, an employee was capable of meeting their tote production standards in an eight hour
work day (Tr. 525).  Plaintiff testified that it took her almost three weeks to reach the eight hour
production standards (Tr. 525).

[4] Plaintiff stated that her job did not require her to stand for long periods of time (Tr.
526).  Although she later claimed that she would stand for roughly two hours in an eight hour
work day, which caused her pain and swelling in her feet (Tr. 527).  In terms of lifting, Plaintiff
typically lifted objects of no more than five pounds (Tr. 527).  If Plaintiff were required to spend
twenty minutes out of an hour, eight hours a day doing some lifting, Plaintiff stated that she
could probably lift around twenty pounds (Tr. 527).  Plaintiff also said she could handle lifting
two-thirds of an eight hour day, but that her "body wouldn't be happy" (Tr. 527).

2000 (Tr. 32-33, 267-69).  On January 19, 2001, Dr. Karayusuf noted Plaintiff's history of

suicide attempts, her recent hospitalizations for depression, and frequent suicidal thoughts (Tr.

267).  He noted her sleeping troubles as well as diminished appetite, concentration, and memory

(Tr. 267).  He also noted her history of drug and alcohol abuse (Tr. 268).  Dr. Karayusuf found

Plaintiff's mood was moderately to severely depressed (Tr. 269).  In Dr. Karayusuf's opinion,

Plaintiff was not able to interact with fellow workers, supervisors, or the public; she was not able

to maintain pace and persistence (Tr. 269).  He diagnosed her with major depression, recurrent;

alcohol dependence in remission; cocaine dependence in remission; and cannabis dependence,

continuous (Tr. 269).

On February 8, 2001, Dr. Thomas Kuhlman, Ph. D., LP, proposed that a twelve month

diary be established on Plaintiff's case (Tr. 272).  Dr. Kuhlman was reluctant to preclude

Plaintiff from work based on the recency of her problems, the absence of an established mental

health treatment history prior to October of 2000, and Plaintiff's credibility issues (i.e. she

denied any drug problems on her daily activities forms)(Tr. 272).  He suggested upon review of

her medical record that frustration with her homelessness, unemployment, and lack of a support

system prompted her suicidal episodes and that when those issues were resolved, she recovered

quickly (Tr. 272).  Dr. Kuhlman also noted that Plaintiff performed well on a formal mental

status exam (Tr. 272).

On November 15, 2001, Plaintiff sought medical treatment at Kenwood Chiropractic Arts

("KCA") for complaints of "all over body" pain as well as severe mid and low back pain

radiating into right lower extremity (Tr. 293).  At that time Plaintiff was 5'9" and weighed 293

pounds (Tr. 293).  In May of 2003, she went back to KCA and complained of low back and right

leg pain (Tr. 294).  Plaintiff weighed 332 pounds (Tr. 294).

In March of 2004, Plaintiff sought emergency room treatment after slipping and falling (Tr. 309).  The physician diagnosed Plaintiff with a bruised mid and low back (Tr. 311). Plaintiff also had a right wrist contusion (Tr. 311).  X-rays were normal (Tr. 313).  On August 10, 2004, an echocardiogram ("EKG") was ordered due to lower extremity edema[5] and bilateral pitting[6] (Tr. 307).  The test showed mild mitral regurgitation[7], tricuspid regurgitation, and pulmonic insufficiency (Tr. 307).

On October 4, 2004, Plaintiff reported a new problem to the SSA- left knee pain (Tr. 158).  On November 1, 2004, Dr. Jacquelyn Ziegler, M.D., Plaintiff's family practice physician, noted that Plaintiff had high blood pressure and was morbidly obese at 328 pounds (Tr. 394). Plaintiff had trace edema bilaterally, venous stasis of the right lower extremity, and dilated veins around the ankle (Tr. 394).  There were no signs of structural back abnormality (Tr. 394-95). However, Plaintiff did have some tenderness over the lumbar portion of the paraspinal muscles bilaterally (Tr. 395).  Plaintiff also had some pain around the sciatic notch bilaterally (Tr. 395). Straight leg raising was positive bilaterally (Tr. 395).  Dr. Ziegler opined that Plaintiff's symptoms were related to her obesity (Tr. 396).  She was given HCTZ (aka. hydrochlorothiazide) tablets for the hypertension (Tr. 395).  Later that month Plaintiff reported

---

[5] "Edema" is defined as "[a]n accumulation of an excessive amount of watery fluid in cells or intercellular tissues." Stedman's Medical Dictionary 612 (28th ed. 2006)(hereinafter "SMD").

[6] "Pitting" is defined as "e[dema] that retains for a time the indentation produced by pressure." SMD at 613.

[7] "Mitral regurgitation" is defined as a "reflux of blood through an incompetent mitral valve." SMD at 1668.

having a headache, low back pain, and difficulty carrying things up and down stairs (Tr. 390-91). Plaintiff continued to have issues with high blood pressure and obesity (Tr. 391). Furthermore, records show that Plaintiff made eleven chiropractic visits in December 2004 for neck, and back pain (Tr. 295).

Dr. Ziegler noted on January 10, 2005, that Plaintiff suffered from schizoaffective disorder in the past (Tr. 389). Plaintiff was diagnosed with intractable abdominal pain, fever, and elevated white blood cell count (Tr. 389). She was taken to the emergency room (Tr. 389). At the emergency room Plaintiff was described as a female with a history of "stable schizophrenia, bronchitis, back problems, and hypertension..." (Tr. 343). Plaintiff was not taking her hypertension medication (Tr. 341). The next day an ultrasound revealed that Plaintiff had an enlarged right ovary with complex cystic mass (Tr. 342). Plaintiff was then admitted to North Memorial Care in Robbinsdale, Minnesota, for IV antibiotics and pain management (Tr. 342). Dr. B.J. Harris, M.D., an Ob/Gyn consultant, diagnosed Plaintiff with pelvic inflammatory disease and tuboovarian abscess (Tr. 342).[8]

Plaintiff was admitted to the hospital again from January 19 to January 25, 2005 (Tr. 333-39). Her doctors diagnosed a right ovarian abscess, leukocytosis, and anemia secondary to menorrhagia (Tr. 337). However, the medical report notes that Plaintiff had not been taking her antibiotics as prescribed and had worsening symptoms since discharge on January 11, 2005 (Tr. 334). On January 21, 2005, Plaintiff underwent total abdominal hysterctomy with lysis of adhesions of the bowel and uterus (Tr. 338-40). A chest x-ray also showed an enlarged heart

---

[8] "Tuboovarian abscess" is defined as "a large abscess [i.e. swelling] involving a uterine tube and an adherent ovary, resulting from extension of a purulent inflamation of the tube." <u>SMD</u> at 6.

7

(which was not addressed at length in the record)(Tr. 351).

Plaintiff again saw Dr. Karayusuf on January 17, 2005, at the request of the SSA for purposes of continuing disability review (Tr. 317-19).  Plaintiff's complained that she was depressed because she could not find a job (Tr. 317).  Dr. Karayusuf noted that since January 2001 (the date he last examined her) Plaintiff had not been hospitalized for psychiatric care, she had not received any outpatient psychiatric counseling, and she had not been taking any psychotropic medications (Tr. 317).  Nevertheless, Plaintiff reported that she continued to feel depressed, tried not to cry, and had no suicidal thoughts (Tr. 317).  Plaintiff reported having issues sleeping no more than two to four hours a night, anxiety, and racing thoughts (Tr. 317).  She also indicated diminished appetite, concentration, and memory (Tr. 317).  She worried about the fact that she lived with a man who was very emotionally abusive to her and took every opportunity to insult her, humiliate her, and put her down (Tr. 317). Plaintiff reported being in constant conflict with her boyfriend (Tr. 318).  She did not drink or use cocaine, but did admit to smoking marijuana every day (Tr. 317-18).  She claimed that smoking marijuana helped her to cope with the stress of living with a man who had no respect for her (Tr. 318).

In terms of daily functioning, Plaintiff reported that she cooked for herself (Tr. 318).  She shopped once a month for groceries, rode the bus with no problems getting around, and did laundry once a month (Tr. 318).  Plaintiff informed Dr. Karayusuf that she watched television and played video games six to eight hours a day (Tr. 318).  She also visited her mother once or twice a month (Tr. 318).

Upon mental status examination, Dr. Karayusuf observed that Plaintiff was oriented to time, place, and person (Tr. 318).  Her recent and remote memory were intact (Tr. 318).  Plaintiff

reported occasional hallucinatory experiences wherein she heard her name being called (Tr. 318).

She reported no delusions and Dr. Karayusuf observed that she had no insight (Tr. 318).  She

related in a subdued, slightly angry manner, but was spontaneous, cooperative, and answered all

questions asked (Tr. 318).  Dr. Karayusuf found Plaintiff's mood to be mildly to moderately

depressed and that her affect was appropriate (Tr. 318).  He diagnosed major depression,

recurrent mild to moderate, in partial remission and continuous cannabis dependence (Tr. 318).

Dr. Karayusuf concluded that Plaintiff would be able to understand, retain, and follow simple

instructions (Tr. 318).  He restricted her to work that involved brief, superficial interactions with

fellow workers, supervisors, and the public (Tr. 318).  Within those parameters, Dr. Karayusuf

believed that Plaintiff would be able to maintain pace and persistence (Tr. 318).

    In a function report dated February 5, 2005, Plaintiff indicated that she was "barely able

to take care of [herself]" (Tr. 127).  She was unable to stand or walk for prolonged periods of

time (Tr. 127).  She could not lift anything more than ten pounds (Tr. 127).  Plaintiff maybe slept

three to four hours a night (Tr. 127).  Plaintiff explained that she had no food because she could

not carry anything home from the store (Tr. 128).  However, Plaintiff also stated that she cooked

"once or twice a week...sometimes once a month" (Tr. 128).  Plaintiff did laundry once a month

and cleaned the kitchen whenever she cooked (Tr. 128).  Plaintiff did not do much housecleaning

because her boyfriend did most of the cleaning (Tr. 129).  She was fiscally responsible (Tr. 129).

She also indicated that she volunteered on a weekly basis (Tr. 130).  Plaintiff stated that she

could follow spoken instructions well and she had no problems getting along with authority

figures, but she did have troubles handling her stress which caused headaches (Tr. 131-32).

Plaintiff identified the root of her stress as the "constant fear of being homeless" (Tr. 133).

On March 1, 2005, Alan Suddard, M.D., the non-examining state agency medical reviewer, found Plaintiff limited to work at the light exertional level (lifting limited to 20 pounds occasionally and 10 pounds frequently, with the capacity to be on her feet a total of six hours in an eight-hour workday)(Tr. 355).  Dr. Suddard cited Plaintiff's morbid obesity; low back pain; hypertension; mild left ventricular hypertrophy, mitral and tricuspid regurgitation, and pulmonic insufficiency; and mild pitting edema/venous stasis (Tr. 355-56).  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 356-358).  It was also noted that there was no treating source statements regarding her physical capacities in his file (Tr. 360).

On March 8, 2005, Dr. R. Owen Nelsen, non-examining state agency psychologist, completed a functional capacity assessment of Plaintiff (Tr. 362-64).  Dr. Nelsen concluded that Plaintiff, for the most part, was not significantly limited in: understanding and memory; sustained concentration and persistence; social interaction; and adaptation (Tr. 362-63).  He opined that Plaintiff would be able to understand, remember, and carry out simple routine work with appropriate sustained pace, concentration, and persistence (Tr. 364).  Dr. Nelsen found her able to tolerate routine, superficial interaction with co-workers and supervisors (Tr. 364).  She was also able to tolerate routine changes and other stressors in the aforementioned environment (Tr. 364).  Plaintiff had an impairment categorized under listing "12.04 Affective Disorders" (Tr. 366).  The specific factors of the listing were not addressed (Tr. 369) and neither the "B" nor "C" criteria were marked (Tr. 376-77).  Dr. Nelsen noted that Plaintiff had no current treatment and compared Dr. Karayusuf's findings from January 2001 and January 2005 (Tr. 378).  Dr. Nelsen cited Dr. Karayusuf's clinical findings that Plaintiff's mental condition had improved (Tr. 378).

10

On March 7, 2005, Dr. Ziegler noted that Plaintiff complained of back pain (Tr. 385). Dr. Ziegler had been treating Plaintiff since October 2004 (Tr. 382-400). Upon examination, Dr. Zielger noticed decreased range of motion and tenderness over the L4-L5 vertebrae (Tr. 386). There was no perineal numbness and strength in the her extremities was equal bilaterally and strong (Tr. 386). She did, however, have significant difficulty changing from positions (i.e. lying down to seated to standing)(Tr. 386). Dr. Ziegler reported that Plaintiff had "relatively severe, disabling low back pain" (Tr. 386). Plaintiff still had issues with morbid obesity and insomnia (Tr. 386).

Plaintiff received the notice from the SSA finding her no longer disabled thereby discontinuing her disability benefits on March 8, 2005 (Tr. 34-50). Shortly after receiving this notice, Plaintiff visited Dr. Ziegler for a routine follow up regarding her hypertension and obesity (Tr. 383). Plaintiff informed Dr. Zielger that she received a letter from the SSA notifying her that her SSI benefits would cease at the end of March (Tr. 382). Plaintiff was very concerned with this news and thought she would end up in the street because her boyfriend did not help her with the rent (Tr. 382). Dr. Zielger was also informed for the first time that Plaintiff had a history of depression and being treated with "white capsules" which helped her symptoms significantly (Tr. 382). Plaintiff, however, said that she had not taken the capsules for many years (Tr. 382). She also told Dr. Ziegler about her suicidal thoughts, but that she had no intent or plan to act on those thoughts (Tr. 382). She described manic episodes that had occurred "a long time in the past" (Tr. 382). She also reported smoking marijuana daily (Tr. 382). At the time of the examination, Plaintiff was not using alcohol or cocaine but did have a history of alcohol and substance abuse (Tr. 382). Dr. Ziegler indicated that Plaintiff had "possible

psychiatric issues" and "possible depression" (Tr. 383).  However, Dr. Ziegler did not feel

comfortable treating Plaintiff with medication without getting further evaluation because her

psychiatric history was "somewhat unclear" to her (Tr. 383).  Accordingly, Plaintiff was advised

and agreed to see a psychologist for further evaluation (Tr. 383).  At subsequent visits with Dr.

Ziegler, Plaintiff made no mention of any depression issues (or any other psychiatric

symptoms)(Tr. 414-20).[9]

In late March 2005, Plaintiff submitted a disability appeal report (Tr. 151-57).  Plaintiff

reported constant headaches and back pain (Tr. 151).  Plaintiff states:

> Food is getting to the point where I don't like it...It is hard to get in and out of the bathtub
> with my back problems.  My headaches can keep me from getting out of bed....Some
> people say I can be vicious when I have those headaches.  I used to get out all the time
> and I barely get out now.  I have to make myself get out of the house at least once a
> week.  Walking is difficult.  If I push myself I can do 4-6 blocks-after that I will be stuck
> in the house [with] pain the next few days" (Tr. 155).

Plaintiff had not been working since she last completed a disability report nor had she

participated in any vocational rehabilitation services, employment services, or other support

services to help her gain employment (Tr. 155-56).

In late April of 2005, Dr. Chambers-Kersh noted that Plaintiff had a history of sleep

apnea[10] and had not been using her CPAP (aka. continuous positive airway pressure) machine

(Tr. 421).  Plaintiff had a history of asthma (Tr. 421).  With medication, Plaintiff's asthmatic

---

[9] Laura Chambers-Kersh, M.D., stepped in for Dr. Ziegler on April 20, 2005, and
examined Plaintiff (Tr. 421-24).  Plaintiff did not mention any depression issues during her visit
with Dr. Chambers-Kersh (Tr. 421-24).

[10] "Sleep apnea" is defined as "central and/or peripheral apnea [i.e. absence of breathing]
during sleep, associated with frequent awakening and often with daytime sleepiness." SMD at
119.

condition improved (Tr. 414-418).  She was taking Albuterol for her asthma every night and "sometimes with exertion such as going up the stairs" (Tr. 421).  At that time, Plaintiff's hypertension was uncontrolled (Tr. 422).  In May of 2005, Plaintiff's hypertension was still uncontrolled due to the fact that she was not taking her medication (Tr. 414-419).

On August 2, 2005, three months after her last medical appointment and nearly five years after last seeking mental health treatment, Plaintiff saw psychologist Dr. Selden (Tr. 480-83). Dr. Selden noted that Plaintiff was "seeking help on an outpatient basis well before reaching a state that she had reached in 2000..." (Tr. 482).  He stated that it did not appear that Plaintiff had received outpatient counseling since 2000 (Tr. 481).  She was also not on any antidepressants or other psychotropic medications since that time (Tr. 481).  During the examination Plaintiff reported many depressive symptoms and occasional suicidal ideation (Tr. 480, 482).  Plaintiff acknowledged that life stressors intensified her depressive symptoms (Tr. 480).  Her alcohol abuse problems were in partial remission, but Plaintiff did admit that she used marijuana as often as she could get it (Tr. 482).  Despite her depression, Dr. Selden noted that Plaintiff was very close with her daughter-in-law, she was helping with child care responsibilities with her grandchildren, and had a sense of humor (Tr. 482).  Dr. Selden recommended that Plaintiff begin a psychotherapy plan and he also believed that her depressive symptoms warranted consideration of anti-depressant medications (Tr. 483).  Plaintiff was started on Wellbutrin XL[11] on August 18, 2005 (Tr. 479).

Plaintiff returned to Dr. Selden on October 6, 2005, and Dr. Selden noted that Plaintiff

---

[11] Wellbutrin XL is an antidepressant medication used for the treatment of major depressive and seasonal affective disorders. See Physician's Desk Reference 1613-14 (61st ed. 2007)(hereinafter "PDR").

had fewer depressive symptoms and her suicidal thoughts had "clearly resolved" (Tr. 475).  She was diagnosed with dysthymic disorder (Tr. 475).[12]  Plaintiff switched medications from Wellbutrin to Effexor[13] claiming that Wellbutrin gave her bad stomach aches (Tr. 474).

Plaintiff saw Dr. Selden on November 15, 2005 (Tr. 472).  Plaintiff had moved out of her son's home and into her own apartment (Tr. 472).  Dr. Selden reported no recent suicidal thoughts; sleep and energy had improved (Dr. 472).  A day later, Plaintiff went back to taking Wellbutrin after she indicated that Effexor "worked for a while and then stopped" (Tr. 471).

Plaintiff's dysthymic disorder continued to improve substantially with psychotherapy and medication; her depressed mood went from moderate to mild (Tr. 447-69).  On January 23, 2006, Plaintiff expressed interest in working at the Salvation Army, but wondered whether it would endanger her SSI benefits (Tr. 465).  Her mood, energy level, and sleep was better (Tr. 465).

On February 22, 2006, Plaintiff visited Jeffrey A. Copeman, M.D., and complained of left elbow pain, which was assessed as probable synovitis (Tr. 438).[14]  Relafen[15] was prescribed and she was given a splint (Tr. 438).

At her next office visit on February 8, 2006, Plaintiff was still extremely nervous that her

---

[12] Dysthmic disorder is a chronic disturbance of mood characterized by mild depression. See http://www.psychologyinfo.com/depression/dysthymic.htm(last visited May 5, 2008).

[13] Effexor is an antidepressent medication used for the treatment of major depressive disorder. See PDR at 3411-12.

[14] "Synovitis" is defined as "[i]nflammation of a synovial embrane, especially that of a joint; in general, when unqualified, the same as arthritis." SMD at 1920.

[15] Relafen is an anti-inflammatory drug used to treat pain caused by arthritis. See http://www.drugs.com/relafen.html (last visited May 5, 2008).

SSI benefits might be cut off (Tr. 463).  Dr. Selden tried to make her less nervous and stated that discontinuing SSI was "fairly rare" and that she should not worry due to her "major depression diagnosis" and other medical problems (Tr. 463).  Plaintiff also indicated during the visit that she wanted to be considered for work at MDI (Tr. 463).[16]  She requested that Dr. Selden write a letter of recommendation for her MDI job application (Tr. 463).  Dr. Selden drafted a letter in support of her application and Plaintiff was very pleased with the letter (Tr. 444-45, 460).

At her March 22, 2006, appointment, Dr. Selden assessed that Plaintiff's attitude had improved and she appeared optimistic, focused, and driven (Tr. 457).  Plaintiff presented a "quite professional" resume to Dr. Selden (Tr. 457).  While Plaintiff was still considering employment with MDI, she showed Dr. Selden a list of other companies with possible job openings (Tr. 457).  Dr. Selden stated, "There was nothing to do but praise her hard work and determination and reinforce her confidence and resolve" (Tr. 457).

By the end of March 2006, Plaintiff was "blanketing the Hibbing area with her resume and with follow-up calls" (Tr. 455).  Dr. Selden noted that he sent records and had several phone calls with Plaintiff's lawyer who was fighting the discontinuance of her SSI benefits (Tr. 455).  When Dr. Selden asked Plaintiff what her long term goal was-employment or SSI disability-she responded that she "wanted to keep her options open" because she had not found a job and did not know if it would be full-time, part-time, minimum wage or better (Tr. 455).  Dr. Selden agreed to support her in both the job search and the SSI issue for the time being (Tr. 455).  His

---

[16] MDI is a non-profit agency, which employs people with disability and disadvantages, engages in plastics manufacturing, packaging, and assembly. See MDI official website, available at http://www.mdi.org/index.htm (last visited May 5, 2008).

assessment of Plaintiff at that time was: "Remarkable progress regarding depression, determination, and motivation" (Tr. 455).

Plaintiff had a work force and general assistance medical examination on March 29, 2006 (Tr. 435-36). Dr. Copeman, assessed her with chronic back pain, morbid obesity, hypertension, dyslipidemia[17], asthma, sleep apnea, and history of chemical dependency (Tr. 436).

On April 7, 2006, Plaintiff was still looking "very actively" for various job opportunities (Tr. 453). Plaintiff had been watching her stepfather's young son at that time (Tr. 453). She reported an upcoming interview with MDI (Tr. 453). Dr. Selden opined that her family stressors remained, but her own stressors were lessening (Tr. 453). She loved having her own place and living near downtown where she could get many things done by walking (Tr. 453). She also enjoyed being financially independent (Tr. 453). Dr. Selden's assessment of Plaintiff was: "Good progress. Her manner and energy level seemed more sustainable and realistic than in the last two visits. Depressive symptoms see much less" (Tr. 453).

On April 11, 2006, Plaintiff saw Dr. Selden's nurse and reported that she did not have any complaints of depression other than "the misery of trying to find a good paying job that [was not] night shift or too far away" (Tr. 452). Plaintiff was sleeping well (Tr. 452). She also complained of "driveby headaches" and that she was going to see her doctor about them the next

---

[17] Dyslipidemia is an elevation of plasma cholesterol and/or triglycerides or a low HDL level that contributes to the development of atherosclerosis. See http://www.merck.com/mmpe/sec12/ch159/ch159b.html (last visited May 5, 2008).

day (Tr. 452).[18]  An April 12, 2006, examination assessed Plaintiff with hypertension (Tr. 434).

Plaintiff reported that she was having "a bad day within a bad week" at her April 25, 2006, visit with Dr. Selden (Tr. 450).  However, in reviewing her adjustment, Dr. Selden reported that Plaintiff "seemed to be selling herself short on remarkable accomplishments" (Tr. 450).  Plaintiff had obtained a job at MDI (Tr. 450).  She was producing up to about 120 plastic postal boxes assembled per hour (Tr. 450).  Her fellow employee interactions were limited, but going "ok" (Tr. 450).  During the middle of the visit Plaintiff started to cry regarding the death of her mother (Tr. 450).  Nonetheless, Dr. Selden characterized Plaintiff's progress as "remarkable" and continued to describe her depressive disorder as mild (Tr. 450).

Plaintiff went to the emergency room for treatment on April 26, 2006, for pain and swelling in the right wrist and middle finger (Tr. 432).  She was diagnosed with tendonitis and given Naprosyn[19] and a splint (Tr. 433).  The next day she had mild swelling of the right wrist and significant pain on the lateral epicondyle of the right forearm (Tr. 431).  Colleen Wallis, PAC, placed her on limited work, eight hours a day, with "lift[ing], carry[ing], push[ing], pull[ing] for 1-3" (Tr. 431).  Dr. Wallis characterized these limitations as sedentary work (Tr. 431).  Plaintiff was diagnosed with right wrist tendonitis with lateral epicondylitis (Tr. 431).[20]  Plaintiff's wrist pain persisted throughout May (Tr. 426, 429-30).  Concurrently, Plaintiff was

_____

[18] Pursuant to the record provided to the Court, Plaintiff made no mention of her headaches the next day.  Although, Dr. Selden's nurse stated that Plaintiff was known to be "very dramatic" (Tr. 452).

[19] Naprosyn is a non-steroidal anti-inflammatory drug used to treat pain, redness, swelling, and heat from different types of arthritis.  See PDR at 2761-65.

[20] "Lateral epicondylitis" refers to inflamation of the epicondyle and often synonymous with "tennis elbow."  SMD at 653.

experiencing bilateral hand discomfort (Tr. 427).  Plaintiff continued to work, but wore a splint (Tr. 427).  She was diagnosed with possible carpal tunnel syndrome (Tr. 427).  Plaintiff also continued to have hypertension (Tr. 428).

On May 30, 2006, Plaintiff saw Dr. Selden's nurse who stated that Plaintiff "appear[ed] to be doing fairly well in regard to mood" (Tr. 449).  The nurse noted that Plaintiff was having problems keeping her apartment clean and that it may be due to her obesity, decreased range of motion ("ROM"), and activity tolerance (Tr. 449).  The nurse also indicated that Plaintiff bought a car and was still working at MDI (Tr. 449).

Shortly thereafter, on June 5, 2006, Dr. Selden continued to note "substantial improvement" in all areas (Tr. 447).  Plaintiff was working full-time at MDI and enjoying it "reasonably well" (Tr. 447).  Her relationship with her son was also improving and she enjoyed her time with her grandchildren (Tr. 447).  Dr. Selden noted that Plaintiff still had some issues sleeping and once was sent home from work because she was too tired (Tr. 447).  Nevertheless, Dr. Selden continued to assess "much improvement" and only "mild" depressed mood (Tr. 447).

In June of 2006, Plaintiff had gastroenteritis (Tr. 425).  Plaintiff still suffered from hypertension, but the record noted that Plaintiff had no been taking her medications (Tr. 425).

On August 3, 2006, Dr. Selden sent Plaintiff's attorney a letter regarding Plaintiff's ability to seek and maintain competitive employment (Tr. 441-43).  Instead of completing the form that Plaintiff's attorney sent him, Dr. Selden drafted a narrative explanation of some of the issues that Plaintiff's attorney had raised in the form (Tr. 441-43).  Dr. Selden explained that all of his office notes he already produced to Plaintiff's attorney answered any questions posed

concerning Plaintiff's disability case (Tr. 441).  He indicated that the three or four pages of checklists sent to him were not applicable to his knowledge of Plaintiff because he would only see Plaintiff in one hour individual therapy sessions approximately once a month (Tr. 441).  He also refused to complete the checklists because he did not have any opportunity to observe Plaintiff in a work setting or her interactions with other clients or employees (Tr. 441).  Dr. Selden stated that when he initially saw Plaintiff that she was presenting many major depressive symptoms, including suicidal ideation, crying many hours per day, very poor sleep, very poor energy, no motivation, no activities, no socialization, and a great deal of family stressors  (Tr. 441-42).  According to Dr. Selden, Plaintiff was "barely functioning" at that time (Tr. 441).  However, Plaintiff's condition substantially improved by March 2006 to the point where Dr. Selden felt that she was ready to seek sheltered workshop employment at MDI (Tr. 442).  Even though Plaintiff's condition had dramatically improved, Dr. Selden did not believe that Plaintiff was ready for competitive employment (Tr. 442).  Plaintiff was not ready for competitive employment in Dr. Selden's opinion because her sleep was still intermittent, she was still quite emotional even though she had largely resolved her suicidal ideation and constant major depressive symptoms, she continued to be socially isolated at work, and she was still dealing with stressful family issues despite being extremely punctual and putting forth great effort at work (Tr. 442).

**MDI Employment Records**

Post-hearing employment records from MDI show that Plaintiff was paid a wage based upon her productivity (Tr. 197-98).  On July 9, 2006, Plaintiff's wages were reduced $0.09 per hour because her productivity did not meet the standard rate (Tr. 198).  An update on Plaintiff's

progress was given on August 4, 2006, which stated:

> She is still wandering and I redirected her back to her station. She is averaging 1.5+ redirects a shift. She has also left her duties and attempted other tasks and was redirected back three times this week. In your next meeting we can again stress the importance of staying focused and on task. OFF TASK behavior includes: wandering, chatting with others, looking for a different chair, getting bandaids, and putting reject plastic away 1 sheet at a time on some occasions (Tr. 208).

On August 10, 2006, Plaintiff was advised of the importance of good attendance in a "Coaching memo" written by a MDI supervisor (Tr. 209). According to the letter, Plaintiff had missed two complete work days in the past 30 days of employment and missed part of her shift on four occasions (Tr. 209). Plaintiff also received a "Verbal Warning memo" regarding her attendance (Tr. 210). The memo indicated that Plaintiff missed five days of work in the month of June (Tr. 210). MDI's records showed that between April 14, 2006, and August 10, 2006, Plaintiff had ten unexcused absences (4/27, 5/9-10, 5/18-19, 6/12-16); 7 excused absences (4/19, 4/26, 5/24, 6/28-30, 7/5); 2 days off for bereavement (7/10-11); 5 days off unpaid as discipline (5/2-5/5, 5/8); 1 day credited to personal time off (8/9); and 1 tardy (7/7)(Tr. 199-202).

**Testimony at Administrative Hearing**

*Plaintiff's Relevant Testimony*[21]

*Vocational Expert's Relevant Testimony*

Edward Utities, a vocational expert, completed a report describing Plaintiff's past work as a telemarketer and deli worker (Tr. 529-30). Initially, Mr. Utities asked Plaintiff several questions about her work at Ticket Master (Tr. 530). Plaintiff indicated that she enjoyed her

---

[21] See supra "Factual Background".

previous employment at Ticket Master and would consider working there again (Tr. 530).

Plaintiff also discussed her employment at MDI (Tr. 531).  Plaintiff told Mr. Utities that there

were three MDI supervisors who assisted employees with any problems on the assembly floor

(Tr. 531).  When Mr. Utities asked Plaintiff whether the supervisors helped her or she had been

doing fairly well on her own, Plaintiff responded that she had "been doing fairly well" (Tr. 531).

After asking Plaintiff several questions about her previous employment, the ALJ

examined Mr. Utities.  Mr. Utities informed the ALJ that he wanted to make a change to his

prehearing vocational report (Tr. 532).  In light of Plaintiff's testimony regarding her work at

Ticket Master, Mr. Utities wanted to classify her job as a ticket agent as sedentary (Tr. 532).[22]

Thereafter, the ALJ proposed a hypothetical to Mr. Utities describing an individual of Plaintiff's

age, educational background, and work history experience (Tr. 533).  This individual had severe

impairments: low back pain, high blood pressure, obesity, swelling in her legs (Tr. 533).  The

ALJ assigned a residual functioning capacity ("RFC")[23] to Plaintiff, based on these impairments,

limiting her lift 20 pounds occasionally; 10 pounds frequently; stand and walk for about six

hours in an eight-hour workday; and unrestricted sitting (Tr. 533).  This individual also needed

low-stress, routine work, with three and four-step tasks, and brief, infrequent, superficial contact

with the public, co-workers, and supervisors (Tr. 533).  In his professional judgment, Mr. Utities

_____

[22] According to The Dictionary of Occupation Titles (hereinafter "DOT"), work as a ticket agent is characterized as a light, semi-skilled position. See DOT 238.367-026.

[23] An RFC rates the residual (i.e. leftover) functioning capacity of a claimant after taking into account the claimant's mental or physical disability. See http://www.disabilitysecrets.com/rfc-medical-source-statement.html (last visited May 5, 2008)(no emphasis added).

opined that Plaintiff could not perform her past work as a ticket agent or deli worker (Tr. 534). However, Mr. Utities stated that her job as a small products assembler and other light, unskilled assembly occupations would fall within the parameters of the ALJ's hypothetical assuming that these jobs were relevant and at substantial gainful activity ("SGA")[24] levels (Tr. 534).

The ALJ then inquired if a person with emotional instability and fits of crying on a regular basis would interfere with the kind of work that Mr. Utities recommended for someone similar to Plaintiff (Tr. 537).  Mr. Utitites responded by saying, "If it interfered with their overall production in terms of how long it lasted, if it drastically interfered with working with other employees, it would be a negative factor" (Tr. 537).  He also opined that substantial reductions in work performance pace caused by emotional problems and fatigue from difficulty sleeping would also be a negative factor to consider when determining one's ability to work (Tr. 537). Mr. Utities indicated that a person who was needing frequent reminders, constantly told to redo work, and given suggestions on a regular basis, would be more akin to sheltered employment (Tr. 538).  Such employment would run counter to the competitive jobs he discussed earlier. Finally, Mr. Utities said that an individual would not be able to work if that individual had no tolerance for the routine stresses of working, getting up, going to work, putting in an eight-hour day, and being consistent in work performance (Tr. 538).

*Post-Hearing Interrogatories to the Vocational Expert*

---

[24] SGA means any significant activity, physical or mental, which is performed for remuneration or profit over a reasonable period of time  See http://www.disabilitybenefits101.org/ca/programs/income_support/ss_disability/ssdi/program.htm (last visited May 5, 2008).  To qualify in 2008, an individual's monthly-earned income must be less than $940. Id.

After the hearing the ALJ submitted interrogatories to Mr. Utities inquiring as to the number of small products assembler positions within the State of Minnesota that fit within the hypothetical presented at the hearing (Tr. 213).  Mr. Utities stated there were approximately 5,000 small products assembly positions in Minnesota (Tr. 216).  The ALJ then asked:

> If the claimant required an average of 1.5 redirects (i.e., reminders to return to assigned work as she was wandering around, attempting other duties without permission, chatting with co-workers, looking for a different chair, [etc.]...)per shift, is that consistent with competitive employment? (Tr. 214).

Mr. Utities responded:

> If a claimant required an average of 1.5 redirects per day I would view that as occasional reminders.  If the 1.5 redirects are based on an hourly basis I would view that as constant reminders and believe that employers would not retain such an individual outside sheltered employment (Tr. 216-17).

### The ALJ's Findings and Decision

As previously stated, on October 3, 2006, the ALJ issued his decision terminating Plaintiff's social security benefits as of March 1, 2005 (Tr. 17-28).  The ALJ followed the sequential five-step procedure as set out in the rules. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).  The Eighth Circuit has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the RFC to perform his or

23

her past relevant work"; and (5) if the ALJ finds that the claimant is unable to perform the past relevant work then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." <u>Fines v. Apfel</u>, 149 F.3d 893, 894-95 (8th Cir. 1998).

The ALJ determined that Plaintiff met the requirements for the first two steps of the disability determination procedure.  The ALJ found that Plantiff had not engaged in substantial gainful activity (Tr. 19).  At step two, the ALJ found that Plaintiff continued to have the same impairments she had at the time of the "comparison point decision" ("CPD")(Tr. 19).[25]  Due to the fact that Plaintiff sought treatment for low back pain and depressive symptoms since the CPD, the ALJ found that her impairments were severe (Tr. 20, 25).  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal one of the listed presumptively disabling impairments as of March 1, 2005 (Tr. 20-21).  In fact, the ALJ indicated that Plaintiff's medical condition had been improving (Tr. 21).  The ALJ determined that Plaintiff's medical condition had improved based on the evidence that she sought no treatment once she was released from the hospital in November of 2000 (Tr. 21).  She also failed to allege any mental impairment or limitation at the State Agency disability hearing in May 2005 and it was not until after their decision that she began alleging severe mental impairment and seeking treatment (Tr. 21).[26]

At step four, the ALJ determined that Plaintiff had the following RFC: (1) lift and carry

---

[25] The most recent favorable medical finding that the claimant was disabled was Dr. Karayusuf's determination dated February 16, 2001 (Tr. 19).  That date is Plaintiff's CPD.

[26] She did, however, report at the May 2005 hearing that her work limitations were caused solely by her physical impairments (Tr. 21).

up to 20 pounds occasionally and 10 pounds frequently; (2) stand and walk up to six hours a day; (3) unrestricted sitting; (4) low stress; and (5) routine three to four step tasks that involve no more than brief and superficial contact with co-workers, supervisors, and the general public (Tr. 22).

As of March 1, 2005, the ALJ concluded that Plaintiff was unable to perform her past relevant work (i.e. deli worker, small products assembler, and ticket agent)(Tr. 25-26). However, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff was able to perform a significant number of jobs in the national economy (Tr. 26-27). Accordingly, the ALJ found that Plaintiff was not disabled (Tr. 27) and discontinued benefits as of March 1, 2005 (Tr. 28).

**Standard of Review**

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id.

In reviewing the record for substantial evidence, the Court may not substitute its own

judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court

should not reverse the Commissioner's finding merely because evidence may exist to support the

opposite conclusion.  Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3

F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would

support the opposite finding).  Instead, the Court must consider "the weight of the evidence in

the record and apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at

1199.

        The claimant bears the burden of proving his or her entitlement to disability insurance

benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v.

Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated he or she

cannot perform prior work due to a disability, the burden of proof then shifts to the

Commissioner to show that the claimant can engage in some other substantial gainful activity.

Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

**Discussion**

### *Dr. Selden's Medical Opinions*

        Plaintiff asserts that the ALJ failed to accord the proper weight to the opinions of Dr.

Selden regarding Plaintiff's functional limitations.  The medical opinion[27] of a treating source[28]

---

        [27] The regulations define "medical opinions" as "statements from physicians and psychologists and other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments." 20 C.F.R. § 404.1527(a)(2).

        [28] "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source" who provides the claimant with medical treatment or evaluation on an ongoing basis. Id. § 404.1502.

is entitled to greater weight and deference than that of a non-treating source.[29] Singh v. Apfel,

222 F.3d 448, 452 (8th Cir. 2000); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991).

Nevertheless, the opinion of a treating source is not conclusive in determining disability.

Cunningham v. Apfel, 222 F.3d 469, 502 (8th Cir. 2000).  The medical opinion of a treating

source is controlling only where the opinion is well supported by medically acceptable clinical

and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence. 20

C.F.R. § 404.1527(d)(2); Cunningham, 222 F.3d at 502.  Therefore, if the treating source's

opinion is inconsistent with other substantial evidence in the record, it will not be afforded

controlling weight.  An ALJ's failure to consider or discuss a treating physician's opinion that a

claimant is disabled "constitutes error where...the record contains no contradictory medical

opinion." Prince v. Bowen, 894 F.2d 283, 285-86 (8th Cir. 1990).

      The ALJ placed little weight on Dr. Selden's opinions stating:

> Clearly Dr. Selden's observations of the claimant's behaviors are not consistent
> with her subjective complaints of fatigue, [un]controllable crying, social isolation,
> and stressful family issues.  Thus, it appears Dr. Selden offered his opinion in
> hopes of helping the claimant maintain her eligibility for disability benefits rather
> than based on objective medical evidence (Tr. 24).

For example, the ALJ noted that on October 6, 2005, Dr. Selden noted she had fewer depressed

symptoms (Tr. 475).  On March 22, 2006, he stated "Wow, what an improved attitude with

optimism, focus and drive"(Tr. 457).  And on June 5, 2006, he reported substantial improvement

in all areas (Tr. 24, 447).  However, on August 3, 2006, Dr. Selden stated that although

---

[29] A "nontreating source" means a "physician, psychologist, or other acceptable medical
source who has examined you but does not have, or did not have, an ongoing treatment
relationship with [the claimant]." Id.

Plaintiff's condition has improved since treatment began in August 2005, "she was not ready for competitive employment" (Tr. 442).  The ALJ concluded that "it appear[ed] Dr. Selden offered his opinions in hopes of helping the claimant maintain her eligibility for disability rather than based on objective medical evidence" (Tr. 24).  Because of the inconsistencies between Dr. Selden's August 2006 opinion and his clinical findings (i.e. remarkable improvement, mild depression, and his encouragement of her aggressive job search), the ALJ did not give great weight to his disability opinion (Tr. 24).  See 20 C.F.R. §§ 404.1527(c), 416.927(c)(when a medical opinion is inconsistent with other evidence or is internally inconsistent, the ALJ is to weigh all the evidence to determine if the claimant is disabled).

Greatest weight was given to the opinions of Dr. Karayusuf, the State Agency psychological consultants, and John Steward, Plaintiff's former live-in boyfriend (Tr. 24).  Dr. Karayusuf opined on January 17, 2005, that Plaintiff had the ability to understand, retain, and follow simple instructions and interact briefly and superficially with co-workers, supervisors, and the general public (Tr. 318).  The non-examining state agency reviewers relied on the information in Dr. Karaysuf's report (Tr. 24).[30]  Mr. Steward stated that Plaintiff had "no problems with grooming, getting along with others, following directions or paying attention...she prepared meals daily, shopped, and paid bills" (Tr. 24).

An opinion rendered by a claimant's treating physician is not necessarily conclusive, however, the Court finds that the ALJ failed to provide good reasons, supported by the record, to discount Dr. Selden's opinions.  The record shows that Dr. Selden's opinions are supported by

---

[30] Such evidence "can be given weight only insofar as they are supported by evidence in the case record." Social Security Ruling 96-6p (hereinafter "SSR").

medically acceptable clinical data and there are no arguments made by the ALJ or Defendant to the contrary.  In fact, Dr. Selden was the first medical source to actually treat Plaintiff and place her on a psychotherapy plan, including anti-depressant medications (Tr. 483).[31]  Dr. Selden's opinions were also not contradictory with other medical opinions in the record, including the opinions of Dr. Karayusuf.  While Dr. Karayusuf noted on January 17, 2005, that since January 2001 (the date he last examined her) Plaintiff had not been hospitalized for psychiatric care, she had not received any outpatient psychiatric counseling, and she had not been taking any psychotropic medications (Tr. 317), he still diagnosed Plaintiff with "[m]ajor depression, recurrent mild to moderate in degree, in partial remission.  Cannabis dependence, continuous" (Tr. 318).  Dr. Selden, on August 2, 2005,  similarly diagnosed Plaintiff with "[m]ajor depression, recurrent, severe w/ some mood congruent psychotic features...Cannabis dependence."  Dr. Selden also indicated that Plaintiff still suffered from "major depression" on February 8, 2006 (Tr. 463).

Additionally, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. 20 C.F.R. § 404.1527(d)(2).  The ALJ failed to do so.  Dr. Selden's opinions were consistent in that even though Plaintiff's condition had marked improvement over the time that he treated her (i.e. remarkable improvement, mild depression, and his encouragement of her aggressive job search), he

---

[31] More weight will be given to the treating source that has knowledge about the claimant's impairments.  See 20 C.F.R. § 404.1527(d)(2)(ii).  The ALJ will "look at the treatment the source has provided and at the kind and extent of examinations and testing the source has performed..." Id.

continually opined that Plaintiff was not yet ready for competitive employment. See Mem. 22

[Docket No. 9]; see also (Tr. 441-45). The letter drafted by Dr. Selden in support of Plaintiff's

application to MDI stated that "it is doubtful that [Plaintiff] could obtain competitive

employment" (Tr. 444). That opinion did not change on August 3, 2006, when Dr. Selden sent

Plaintiff's attorney a letter regarding Plaintiff's ability to seek and maintain competitive

employment (Tr. 442). At that time, Dr. Selden opined that, "[Plaintiff] has improved

substantially so that by March 2006 I felt she was ready to seek sheltered workshop

employment...but I still do not feel she is ready for competitive employment" (Tr. 442)(emphasis

added).

     That same opinion with respect to Plaintiff's ability to hold competitive employment is

also consistent with Plaintiff's attendance record at MDI. Mr. Utities testified that competitive

employers would not tolerate absences exceeding three per month (Tr. 537). Plaintiff had a total

of 17 excused and unexcused absences, 2 days off for bereavement, and 1 day off credited to

personal time between April 14, 2006, and August 10, 2006 (Tr. 199-202) This was a total of 20

days in less than 4 months, or an average of about 5 days per month (not counting the 5 unpaid

days off as discipline)(Tr. 198-201). Plaintiff had trouble staying on task and needed to be

redirected (Tr. 208). As Plaintiff asserts, "All of this is consistent with severe problems with

concentration, persistence and pace-the vocational limitation that caused disability benefits to be

granted...in 2001." See Pl.'s Mem. 22; (Tr. 22).

     The ALJ and Defendant also placed great emphasis on the fact that Plaintiff never sought

mental health treatment from February of 2001 until the time her benefits ceased. Nevertheless,

Dr. Selden's opinions explain this concern and should also be entitled to controlling weight

because the record shows great fluctuation in symptoms depending on the degree of stress to which Plaintiff was subjected to. See Mem. 24 [Docket No. 9].[32]  For example, Dr. Karayusuf noted that Plaintiff had no suicidal thoughts at the time he examined her (Tr. 317).  Dr. Selden, however, indicated that Plaintiff mentioned "somewhat impractical plans regarding suicide" upon examining her on August 2, 2005 (Tr. 482).  Plaintiff claims that her fluctuating symptoms are not proof that her disability ceased and the Court agrees.[33]

The ALJ also stated, "Clearly Dr. Selden's observations of the claimant's behaviors are not consistent with her subjective complaints of fatigue, controllable crying, social isolation, and stressful family issues" (Tr. 24).  However, on March 31, 2005, Dr. Ziegler noted depressive symptoms including tearfulness, suicidal thoughts, auditory and visual hallucinations, and referred Plaintiff to Dr. Selden (Tr. 382-83).  Dr. Selden also noted that Plaintiff would cry many hours a day, slept only 3 to 4 hours, had fluctuating energy levels, had occasional suicidal

---

[32] The ALJ and Defendant argue that Dr. Selden offered favorable disability opinions "in hopes of helping the claimant maintain her eligibility for disability benefits rather than based on objective medical evidence." See Def.'s Mem.15-16; (Tr. 24).

[33] "It is inherit in psychotic illnesses that periods of remission will occur," and that such remission does not mean that disability has ceased. Miller v. Heckler, 756 F.2d 679, 681 n.2 (8th Cir. 1985)(per curiam)(quoting Dreste v. Heckler, 741 F.2d 224, 226 n.2 (8th Cir. 1984)(per curiam)).  "[O]ne characteristic of a mental illness is the presence of occasional symptom-free periods." Poullin v. Bowen, 817 F.2d 865, 875 (D.C. Cir. 1987).  Although the mere existence of symptom-free periods may negate a finding of disability when a physical ailment is alleged, symptom-free intervals do not necessarily compel such a find when a mental disorder is the basis of a claim. Id.  The Social Security regulations also recognize that:

 [I]f you have organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs.  In such a case, you may be much more impaired for work than your symptoms and signs would indicate.  The results of a single examination may not adequately describe your sustained ability to function. 20 C.F.R. Part 404, Subpart P, Appx. I, Listing 12.00E.

ideation and delusional thoughts, remained socially isolated, and continued to deal with stressful family issues (Tr. 442, 444, 447, 450, 453, 460, 463, 465, 469, 472, 475, 477, 480, 482).  He gave her a Global Assessment of Functioning ("GAF") of 45 (Tr. 483), a level of impairment consistent with disability.[34]  Dr. Selden summarily stated (while consistent with his other medical opinions) on August 3, 2006, that Plaintiff was not ready for competitive employment because her sleep was still intermittent, she was still quite emotional even though she had largely resolved her suicidal ideation and constant major depressive symptoms, she continued to be socially isolated at work, and she was still dealing with stressful family issues despite being extremely punctual and putting forth great effort at work (Tr. 442).

The Court would also note that Dr. Karayusuf did not have the same treating relationship that Dr. Selden had with Plaintiff.[35]  Dr. Karayusuf examined Plaintiff once between February 16, 2001 (the CPD) and March 1, 2005 (the date Plaintiff's disability ended as determined by the ALJ).  While Dr. Selden did not begin treatment with Plaintiff until after March 1, 2005, the record reflects that he did examine Plaintiff with more depth and frequency than Dr. Karayusuf.[36]

_____

[34] GAF represents "the clinician's judgment of the individual's overall level of functioning."  A scale of 0 to 100 is used, on which 10 represents "persistent danger of severely hurting self or others", and 100 represents "superior functioning in a wide range of activities."  On this scale, a GAF of 41 to 50 represents "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic & Statistical Manual of Mental Disorders, pp. 30-32 (4th ed. 1994)

[35] "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998); see also 20 C.F.R. § 404.1527(d)(2)(i).

[36] Dr. Selden saw Plaintiff on twelve separate occasions within a ten-month span: August 2, 2005; October 6, 2006; November 15, 2005; January 5, 2006; January 23, 2006; February 8, 2006; March 6, 2006; March 22, 2006; March 28, 2006; April 7, 2006; April 25, 2006; and June 5, 2006.

Because the Court finds that the ALJ erred in giving the greatest weight to Dr. Karayusuf and substantial evidence in the record supports the opinions of Dr. Selden, the Court thereby finds that the non-examining state agency psychological consultants should also be given less weight due to the fact that they merely relied on Dr. Karayusuf's opinions (Tr. 362-64, 378). See Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004)("[W]e do not consider the opinions of non-examining, consulting physicians standing alone to be 'substantial evidence.'"; see also 20 C.F.R. § 404.1527(d)(2)(i); Kelley, 133 F.3d at 589.

Moreover, this Court's decision to give controlling weight to Dr. Selden is further supported by the ALJ's decision to give greater credibility and weight to the opinions of Plaintiff's former live-in boyfriend over Dr. Selden (Tr. 24).  The Court disagrees with this decision for several reasons.  First, the fact that Plaintiff could perform household chores and handle personal grooming tasks does not necessarily disprove disability (see generally Easter v. Bowen, 867 F.2d 1128, 1130 (8th Cir. 1989)), especially considering Plaintiff's fluctuating mental and emotional state.  Second, Mr. Stewart is not an "acceptable medical source" as defined under 20 C.F.R. § 404.1502 and his statements should not be afforded any weight to support the "objective medical evidence of the record" (Tr. 24).  Third, the Court also questions the ALJ's credibility determination of Mr. Stewart when it appears as though he was possibly a contributing factor to Plaintiff 's unstable mental state and/or purposefully providing unfavorable disability information regarding Plaintiff to the ALJ (Tr. 382, 385, 460, 481).[37]  Even Dr.

---

[37] The Court assumes that the former live-in boyfriend that Plaintiff mentions throughout the record is Mr. Stewart.  Even if Mr. Stewart is not the alleged boyfriend in the record, the Court nevertheless finds Mr. Stewart's opinions are not credible for the other reasons stated above.

Karayusuf reported that "[Plaintiff] indicated that when she got home from the hospital, instead

of being greeted with concern and compassion by [Mr. Stewart], he condemned her for not being

around to take care of things...She is in constant conflict with him" (Tr. 317-18).  Thus, for all

the foregoing reasons the Court finds that the ALJ's erred in failing to properly credit the opinion

of Dr. Selden.

### _Insufficient Medical Improvement to Perform Substantial Gainful Activity_

Plaintiff also argues that the record as a whole does not show sufficient medical

improvement to allow her to perform substantial activity; thus, her disability did not cease.  See

Mem. 26 [Docket No. 9].  More specifically, Plaintiff contends that her many absences and

frequent need for redirection at MDI proved that she was not capable of competitive

employment. Id. at 27-28.  The ALJ held that Plaintiff had not engaged in substantial activity

through March 1, 2005, the date her disability ended (Tr. 19, 26).  With respect to her work at

MDI, the ALJ found that this work was irrelevant because it occurred after the date that

Plaintiff's disability ended as determined by the ALJ (Tr. 19).  Nonetheless, this Court is tasked

with reviewing the record as a whole and weighing all the evidence in the record. See Gavin, 811

F.2d at 1199.

Disability is defined as the inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment. 20 C.F.R. § 404.1594. "[S]ubstantial

gainful activity means performance of substantial services with reasonable regularity, either in

competitive or self-employment." Weiland v. Barnhart, 239 F.Supp.2d 875, 885-86 (N.D. Iowa

2002)(citing Markham v. Califano, 601 F.2d 533, 534 (10th Cir. 1979); Cerrone v. Shalala, 3

F.Supp.2d 1174, 1178 (D. Col. 1998)).   While it is true that Plaintiff's work at MDI was gainful

in that she was getting paid for her work (see 20 C.F.R. § 404.1572(b)), the Court finds that

Plaintiff failed to perform "substantial services with reasonable regularity."  Plaintiff took two

weeks off in addition to the two days the employer granted for bereavement.  In four months

Plaintiff had a total of 20 days off[38] with excused and unexcused absences, bereavement and

personal time, and was given 5 days off as discipline (Tr. 198-201).[39]  Plaintiff also needed more

than 1.5 redirects per shift, often wandered off from her duties, and had to be redirected back to

work 3 times in a week (Tr. 208).[40]  Based on these reasons, including the controlling and

credible opinions of Dr. Selden mentioned above, the Court finds the record does not show

medical improvement to restore Plaintiff's ability to do any substantial gainful activity. See 20

C.F.R. § 404.1594.

**Conclusion and Recommendation**

        Having reviewed the entire record, including Plaintiff's testimony, the uncontradicted

---

[38] The vocational expert even testified that absences in excess of 3 per month would not be tolerated in competitive employment (Tr. 537).  And the Court agrees with Plaintiff that it was an error for the ALJ to fail to include Plaintiff's frequent absences in the hypothetical presented to Mr. Utities.  As a result, Mr. Utities testimony should not constitute substantial evidence supporting a finding that she was no longer disabled and able to perform substantial gainful activity. See Pickney v. Chater, 96 F.3d 294, 297 (8th Cir. 1996).

[39] The ALJ acknowledged that Plaintiff had a lot of unexcused absences while she was working at MDI, but argued that "most were non-disability related" (Tr. 27).  The Court, however, agrees with Plaintiff that her absences "demonstrate her intolerance for stress" and an inability to maintain pace and persistence for full-time competitive employment. See Pl.'s Mem. 28.

[40] The ALJ stated that this behavior "suggests the claimant is bored with her job duties rather than being unable to perform the duties" (Tr. 27).  The Court disagrees and finds these on-the-job issue offer further evidence of Plaintiff's inability to remain focused and concentrate on the tasks at hand.  As Plaintiff states, "In a competitive job an employee has to stay on task whether or no she finds the work boring." See Pl.'s Mem 28.

opinions of Dr. Selden, and the assessment of the vocational expert, the Court finds that there is not substantial evidence in the record to support the ALJ's findings.  In reviewing administrative decisions, it is the duty of the Court to evaluate all of the evidence in the record, taking into account whatever in the record fairly detracts from the ALJ's decision. <u>Easter</u>, 867 F.2d at 1131 (citations omitted).  While there is some evidence indicating that Plaintiff's medical condition from a mental standpoint had improved, the record substantially indicates that Plaintiff continues to suffer from depression and that this mental condition has a disabling effect on her ability to seek competitive employment.  The record as a whole does not show medical improvement sufficient to restore Plaintiff's ability to perform substantial gainful employment.  Thus, Plaintiff's disability continues. 20 C.F.R. § 404.1594(b).

The Court **recommends** that the Commissioner's Motion for Summary Judgment [Docket No. 11] be **denied** and the Plaintiff's Motion for Summary Judgment [Docket No. 8] be **granted.**  Accordingly, the judgment should be reversed with directions to the District Court to remand this matter to the Secretary for an award of benefits in the appropriate amount. <u>See Andler v. Chater</u>, 100 F.3d 1389, 1394 (8th Cir. 1996)(if a claimant is disabled on the record, the court may reverse and remand for entry of an order granting benefits).


Dated:  May 9, 2008

    s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge

**Notice**

Pursuant to Local Rule 72.2 (b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **May 23, 2008.**